UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------x
TARYN SINGER,                          )
individually and on behalf of          )
all others similarly situated,         )
                                       )          Case No. 7:17-cv-02507-VB
                                       )
                 Plaintiff,            )
                                       )
         - against -                   )
                                       )          CLASS ACTION
AMERICAN EXPRESS                       )
CENTURION BANK,                        )          JURY DEMANDED
                                       )
                                       )
                 Defendant.            )
-------------------------------------------------x
```

**SECOND AMENDED COMPLAINT**

1.      This action seeks redress for the unlawful practices of Defendant American Express Centurion Bank ("Amex" or the "Bank"), for providing, in connection with its credit-card accounts, disclosures with inaccuracies or omissions that violated the federal Truth in Lending Act ("TILA") and state consumer protection ("UDAP") statutes.

2.      As alleged in greater detail below, Amex failed to furnish billing statements or other account disclosure documents with complete and accurate information regarding (i) the possible imposition of penalty rates for a late payment and (ii) fees for issuance or continued availability of credit ("Membership Fees"),  in the manner mandated by TILA and its implementing regulations.

1

3.     TILA's purpose is to assure meaningful disclosure of credit terms in order to (i) allow consumers to compare more readily the various credit terms available; (ii) enable consumers to avoid the uninformed use of credit; and (iii) protect consumers against inaccurate and unfair billing practices. 15 U.S.C. § 1601(a). The Bank's conduct violates the express provisions of the TILA and the applicable Regulations.

4.     Defendant's failure to properly provide the required warning to Plaintiff and other consumers about the full account-related consequences of not paying the required amount due by the payment due date is contrary to the enunciated purposes of TILA; the inadequate disclosure effectively thwarts consumers from comparing credit repayment options similarly, and, instead of enabling them to avoid the uninformed use of credit, does the opposite.

5.     Similarly, Defendant's failure to provide the required disclosures to Plaintiff in connection with Membership Fees runs contrary to those enunciated purposes of TILA.

6.     Defendant's failure to make each of these disclosures results in the harm, or the risk of the harm, of an increase in the cost of credit to Plaintiff and other consumers.

7.     Moreover, Defendant's failure to make each of these disclosures results in the harm, or the risk of harm,  to the levels of credit consumer protection and information that Congress mandated for open-end credit users like Plaintiff.

8.      Under the private enforcement provisions of TILA, Plaintiff and the

proposed Sub-classes seek the recovery of statutory damages of up to $1,000,000

with respect to each of the Bank's failures to comply, plus actual damages.

9.      Under the private enforcement provisions of Utah UDAP statutes, as

described more fully below, Plaintiff and the proposed Sub-classes seek the recovery

of maximum statutory damages with respect to each of the Bank's violations, plus

actual damages.

### *Jurisdiction and Venue*

10.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331,

1337 and 1367, as well as under 15 U.S.C. § 1640(e), because this action arises

under TILA, 15 U.S.C. § 1601 *et seq.*

11.     This Court should exercise review of this action, including the related

state law claims, because Defendant furnished a billing statement or statements or

other written communications to Plaintiff that, failing to fully and properly disclose

(i) the negative consequences of a late payment on an extension of credit and (ii) the

terms of either her initial or her subsequent Membership Fees upon account

renewal — in violation of TILA and its implementing regulatory provision —

constituted a concrete and particularized injury to her informed use of credit and to

her. U.S. Const., Art. III, §2, Cl. 1.

12.     Venue is proper in this district because (1) the Bank transacts business

in this district; (2) the Bank extended credit and provided the disclosures at issue to

Plaintiff in this district; and (3) the interests of justice require maintenance of this action in this district.

*Parties*

13.     Plaintiff Singer resides in Rockland County, New York.

14.     Singer is a "consumer," as that term is defined by § 1602(h) of TILA, because this complaint arises from the Bank's offer and extension of credit to Singer, a credit card holder, for personal, family or household purposes.

15.     Upon information and belief, the Bank is a corporation doing business in the State of New York and throughout the United States, with corporate headquarters in Utah.

16.     Amex is a "creditor," as that term is defined by § 1602(f) of TILA and Regulation Z ("Regulation Z"), 12 C.F.R. §1026.2(a)(17), because at all relevant times, the Bank, in the ordinary course of its business, regularly – *i.e.*, more than 25 times a year – extended or offered to extend consumer credit for which a finance charge is or may be imposed, which is payable in more than four installments.

*Factual Allegations*

17.     Singer is the holder of a "Blue Cash Preferred" credit card account issued by Defendant and used for household purposes.

18.     Upon information and belief, the credit-card account that the Bank furnished Singer in or about November 2015 included two standard features, each of which was subject to the imposition of a penalty rate: (1) a Cash Advances feature under which Singer could obtain, for a fee, cash or cash equivalents, through a

4

participating institution;  and (2) a Purchases feature under which Singer could use the card for merchandise or services from a participating retailer. See <u>Exhibit A</u> (Renewal Notice on Singer's October 2016 statement with key account terms).

19.     The April 2016 billing statement that the Bank furnished Singer on or about April 27, 2016 included a Late Payment Warning — a mandatory disclosure that advises the customer of all the negative financial impacts on the account, under the prevailing terms of the credit card agreement, if the customer were to fail to make the minimum required payment in a timely fashion. <u>Exhibit B</u>.

20.     The Late Payment Warning on the April 2016 billing statement disclosed that if Singer were to not make the minimum payment due by the payment due date, the Annual Percentage Rate on her Purchases balances (her "Purchases APR") would be subject to a re-pricing from the standard rate of 13.49% to a higher "penalty rate" of 29.49%.

21.     Upon information and belief, the prevailing terms of Singer's card agreement in April 2016 called for, in the event of such a failure to make a timely payment, not just a re-pricing of her Purchases APR, but a re-pricing of the Annual Purchases Rate on her Cash Advance balances ("Cash Advances APR"), as well — from the then-available standard rate of 25.49% to a higher penalty rate of 29.49%.

22.     Thus, the Bank's limited disclosure to Singer that her "Purchase APR may be increased to a Penalty APR of 29.49%" was a misrepresentation of the penalty terms of the account.

23.    All members of the Sub-class, as defined herein, were furnished billing statements with Late Payment Warnings that failed to completely and accurately disclose, in violation of the statute and its implementing regulations, that a late payment could, aside from triggering a re-pricing penalty that would result in an increased interest rate for the standard Purchases balance, trigger a re-pricing penalty that would result in an increased interest rate for account balances other than the Purchases balance.

24.    Further, Amex furnished a disclosure on page 7 of Singer's October 2016 billing statement that her account was pending renewal and that she would be billed a fee. Exhibit A.

25.    Amex's notifications violated federal law and state consumer law for not  disclosing the terms of a fee-based account renewal in compliance with TILA, and/or for misrepresenting those terms.

26.    All members of the Sub-class, as defined herein, were furnished account renewal materials from Amex with disclosures similar to those received by Plaintiff any time since April 6, 2015.

27.    Further, upon information and belief, Amex furnished Singer materials in or about November 2015 when she applied for her account, and after she was approved, disclosing a fee of $75.00 (the "Membership Fee") associated with this account, and the package of consumer benefits included with her paid membership.

6

28.    Upon information and belief, although this fee was represented as an annualized amount, the Membership Fee during the relevant period was monthly in nature, as evidenced by (i) Amex's prorated refunds of the Membership Fee to those whose accounts were kept open, or as is, for only part of the year and (ii) Amex's subsequent amendment to the card agreement making Membership Fees wholly nonrefundable, except for Massachusetts residents. Exhibit C.

29.    All members of the sub-class, as defined herein, were furnished account materials from Amex with advertising and other disclosures similar to those received by Plaintiff any time since April 6, 2015.

*Class Allegations*

30.    Singer brings this action individually and on behalf of all persons similarly situated.

31.    The LPW Sub-class consists of all persons who were provided a Billing Statement by Defendant with a Late Payment Warning that did not disclose that a late payment could trigger a re-pricing penalty that would increase the APR on account balances other than the Purchase balance when their account terms indeed provided for such re-pricing.

32.    The Renewal Sub-class consists of all persons who, since April 6, 2015, were provided a Billing Statement or other document by Defendant disclosing a pending renewal of the account and  Membership Fee charge in a form substantially similar to the disclosure made in Exhibit A.

33.    The Membership Sub-class consists of all persons who, since April 6, 2015, were provided materials by Defendant disclosing an Annual Membership Fee without disclosing that the fee, while debited once a year, accrued on a monthly basis.

34.    Specifically excluded from these Sub-classes are Defendants, any entity in which Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries or assigns of any such individual or entity.

35.    In the case of each of these Sub-classes, the Sub-class members for whose benefit this action is brought are so numerous that joinder of all Sub-class members is not practicable. In light of the tens of thousands of credit cards issued by the Bank, the number of Sub-class members is believed to be in excess of 1,000 persons.

36.    Plaintiff's claims are typical of, if not identical to, all members of the Sub-classes and she does not have any interest that is adverse or antagonistic to the interests of the Sub-classes. If the conduct of the Bank violates TILA as applied to Singer, then it violates TILA with respect to each member of the Sub-classes.

37.    Plaintiff will fairly and adequately protect the interests of each member of the Sub-classes as she is committed to the vigorous prosecution of this action and, to that end, has retained competent counsel experienced in complex litigation of this nature.

38.     The Sub-classes are proper for certification under Rule 23(b)(2) of the Federal Rules of Civil Procedure. The Defendant's actions complained of herein are generally applicable to all Sub-class members, thereby making final injunctive relief appropriate with respect to each Sub-class as a whole.

39.     Each Sub-class is also proper for certification under Federal Rule of Civil Procedure 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein. Because damages suffered by individual Sub-class members may be relatively small, the expense and burden of individual litigation make it impracticable for the class to seek redress individually for the wrongs they have suffered. Members of the Sub-class do not have a particular interest in individually controlling the prosecution of separate actions.

40.     There are questions of law and fact which are common to the members of the Sub-classes and which predominate over questions affecting only individual members. Common questions of law and fact include, but are not limited to, (i) whether the Bank has a standardized procedure by which it makes Late Payment Warning disclosures regarding penalty rates applicable to the several features on its customers' accounts in ways that are compliant with TILA and Regulation Z; (ii) whether the Bank has a standardized procedure by which it makes account renewal disclosures in ways that are compliant with TILA and Regulation Z; and (iii) whether the Bank has a standardized procedure by which it makes Membership Fee disclosures in ways that are compliant with TILA and Regulation Z.

41.     Upon information and belief, each of the Sub-classes consists of thousands of customers.

42.     Thus, a class action is an appropriate and superior method for the fair and efficient adjudication of the present controversy given the following factors:

a) Common questions of law and/or fact predominate over any individual questions which may arise and, accordingly, there would accrue enormous savings to both the Court and the Sub-classes in litigating the common issues on a class-wide instead of a repetitive individual basis; and

b) The aggregate volume of the individual Sub-class members' claims, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable this case to be litigated as a class action on a cost-effective basis, especially when compared with repetitive individual litigation.

43.     Class certification is also fair and efficient because prosecution of separate actions by individual Sub-class members would create a risk of differing adjudications with respect to such individual members of the Sub-class, which as a practical matter may be dispositive of the interests of other members not parties to the adjudication, or substantially impede their ability to protect their interests. Moreover, since the actual monetary damages suffered by, or statutory damages available to, individual Sub-class members may be relatively small, although significant in the aggregate, the expenses and burdens of individual litigation make it impossible or effectively impossible for the members of each of the Sub-classes to seek individual redress for the TILA violations committed by Defendant.

44.     Plaintiff anticipates that there will be no difficulty in the management of this litigation. The records of the individuals encompassed within the Sub-classes are in Defendant's possession.

## Violations of the Truth in Lending Act

45.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

46.     Congress originally authorized the Federal Reserve Board ("FRB" or "Board") to promulgate regulations granting it broad authority to effectuate the purposes of TILA; that authority is now delegated to the Bureau of Consumer Financial Protection ("Bureau"). 15 U.S.C. § 1604(a)(2008); 15 U.S.C. § 1604(a).

47.     The set of regulations that the FRB promulgated to implement TILA is known as Regulation Z. 12 C.F.R. §226.1 *et seq.*

48.     To reflect its assumption of TILA rulemaking authority as of July 21, 2011, the Bureau issued an interim final rule republishing Regulation Z and adopting the FRB's promulgated regulations with only minor changes that did not impose any new substantive obligations on creditors. 76 FR 79768 (Dec. 22, 2011); 12 C.F.R. §1026.1 *et seq.*

### The Late Payment Warning / Penalty Rate Disclosure Violation

49.     TILA requires open-end credit issuers such as the Bank to send a periodic statement after the close of the billing period ("Billing Statement") to its

11

customers with an outstanding balance on their credit card accounts. 15 U.S.C. §1637(b).

50.     In the last decade, Congress began to more closely examine various practices in the credit card industry it deemed "abusive," including the re-pricing of a consumer's credit card account with "penalty rates" when that consumer missed a payment, and proceeded to amend TILA to put a halt to them. H.R. Rep. 111-88 at 10-12 (April 27, 2009); S. Rep 111-16 at 1-10 (May 4, 2009).

51.     In addition to curbing the abusive application of penalty rates, Congress, in keeping with the purposes of the statute — to help consumers avoid the uninformed use of credit, to help consumers better compare credit options, and to avoid unfair billing practices — amended TILA to require the Billing Statement to carrying a warning of the cost consequences to the consumer if any minimum payment due under the agreement is not paid by the due date ("Late Payment Warning"). Credit Card Accountability Responsibility and Disclosure Act of 2009, P.L. 111-24, § 202 (May 22, 2009); 15 U.S.C. §1637(b)(12).

52.     Included in these "Requirements Relating to Late Payment Deadlines and Penalties" is the requirement to advise consumers, when applicable under the card agreement, that the account could be subject to an interest rate re-pricing in the event a payment deadline is missed, with "conspicuous notice of such fact, together with the applicable penalty annual percentage rate."  15 U.S.C. §1637(b)(12)(B).

53.     Armed with this information, Plaintiff and other credit consumers could better evaluate how they should utilize the various lines of credit available to them — for example, which account they should use for new transactions, which account they should pay in a timely fashion, and which account they could pay later with minimal adverse consequences.

54.     Accordingly, the Bureau promulgated regulations to implement this statutory provision and required the Billing Statement to disclose  "[t]he amount of any late payment fee and any increased periodic rate(s) (expressed as an annual percentage rate(s)) that may be imposed on the account as a result of a late payment. . . . If the rate may be increased for more than one feature or balance, the card issuer may state the range of rates or the highest rate that could apply and at the issuer's option an indication that the rate imposed could be lower." 12 C.F.R. §1026.7(b)(11).

55.     The Bureau also promulgated a Model Form for making this "Late Payment Warning" disclosure on the billing statement. 12 C.F.R. §1026.7(b)(13); 12 C.F.R. Part 1026 Supp. I, Appendix G-18.

56.     A Late Payment Warning that incorrectly discloses that a missed payment could trigger a penalty APR on one account balance segment, when under the terms of the agreement the missed payment could trigger a penalty APR on <u>all</u> account balance segments, harms the consumer in a concrete way because it subjects him to the risk of the harm — and in some cases, the harm — of losing the standard APRs on future balances for the undisclosed segments.

13

57.     Moreover, a Late Payment Warning that omits the amount of the penalty APR prevents the consumer from evaluating the consequences of losing the currently applicable APR; he is harmed in a concrete way because he is not fully informed about the account terms, cannot successfully comparison shop, and could easily end up paying more for the credit extended to him than he had to. Consequently, the central purposes of the Act are defeated.

58.     The mandatory penalty APR disclosure is quite literally a "price tag," that was supposed to inform Plaintiff of the costs of using her card in certain ways. The incorrect "price tags" attached to the various credit cards in her wallet could very well have led her to unwisely choose between two extensions of credit — that is, pay off one credit card rather than another — based on incorrect information.

59.     Plaintiff herself was at risk of a tangible harm — losing the availability of the standard APRs for Cash Advances, Balance Transfers and/or any additional available features other than standard Purchases  and having to pay more for credit in the way of penalty APRs — had she missed paying the minimum due by the due date.

60.     Under TILA and Regulation Z, Plaintiff was legally entitled to have this particular piece of information disclosed to her in each monthly statement prepared by the Bank. This is because Congress, after observing that lack of information concerning a penalty APR could adversely affect consumers' credit behavior, made a legislative judgment that monthly disclosures were the best way to counter that risk. In other words, while Congress could have decided to counter

some risk by requiring a one-time penalty APR disclosure, it instead undertook to further reduce that risk by requiring creditors to perpetually remind consumers of the penalty APR, and to specify what the potential penalty rate might be.

61.     The Bank sent Singer and other consumers in the Class a Billing Statement with a Late Payment Warning that made this, or a substantially similar disclosure: "If we do not receive your Minimum Payment Due by the Payment Due Date of [date], you may have to pay a late fee of up to $37.00 and your Purchase APR may be increased to the Penalty APR of 29.49%."

62.     However, at the time the Late Payment Warning with that verbiage was furnished, Singer and other consumers in the Class had a Cash Advances feature, a Balance Transfer feature and/or another feature other than the standard Purchase feature also subject to a penalty increase in APR in the event of a missed payment deadline, and not merely the Purchase feature as the disclosure asserted.

63.     As such, the Bank's Late Payment Warning understated the consequences of a missed payment, harmed Singer concretely by denying her the full account information that Congress required she receive with her Billing Statement.

64.     Moreover, the Bank's Late Payment Warning, in understating the consequences of a missed payment, caused Singer a material risk of harm in that she was unknowingly subject to losing access to the lower standard interest rates on Cash Advance and Balance Transfer balances in the event of a missed payment,

15

and would have had to pay higher penalty rates for the extension of credit under those features.

65.     Similarly, each of the Bank's failures to disclose on the Billing Statements it sent to other members of the Class the full consequences of missing a payment deadline constituted a concrete harm or created a material risk of concrete harm to those consumers.

*The Account Renewal Notice Violation*

66.     Regarding all customers who are periodically charged a fee for the availability of credit, TILA and Regulation Z require open-end credit issuers such as the Bank to send them clear and conspicuous notice that a new fee is pending in connection with a renewal of the account — and what measures they must take, and by when they must take them, to avoid that fee ("Account Renewal Notice" or "ARN"). 15 U.S.C. §1637(d), 12 C.F.R. §1026.9(e).

67.     When an issuer furnishes an ARN with a billing statement, it is required to provide notice to the consumer on the front page of the statement. 12 C.F.R. §1026.9(e)(2).

68.     The ARN Defendant furnished Plaintiff appeared on page 7 of her 12-page billing statement, and, with no reference to that ARN on the front page of the statement, Plaintiff did not see the notice. Exhibit A.

69.     Further, the ARN did not state precisely what measures Plaintiff had to take with respect to the account, and by which date Plaintiff had to take them, to avoid paying the pending fee.

70.     The bank's failures in this respect caused harm, or at least a risk of harm in that it did not properly apprise Plaintiff how and when to act to avoid the imposition of an additional cost of credit and shop for an alternative, lower-cost credit option.

*The Membership Fee Disclosure Violation*

71.     Regarding all customers who are charged a fee for the availability of credit, TILA and Regulation Z require open-end credit issuers such as the Bank to disclose the "method of computation" of that fee. 15 U.S.C. §1637(a)(5), 12 C.F.R. §1026.6(b)(2)(ii).

72.     Although American Express represented this as an annual fee in its disclosures, for a time during the relevant period it computed and imposed this fee on a monthly basis, as evidenced by (i) Amex's prorated refunds of the Membership Fee to those whose fee-based accounts were kept open, or as is, for only part of the year and (ii) Amex's subsequent amendment to the card agreement making Membership Fees wholly nonrefundable. Exhibit C.

73.     The bank's failures in this respect caused harm, or at least a risk of harm, in that it did not properly apprise Plaintiff how and when she could act to avoid the imposition of an additional cost of credit and shop for an alternative, lower-cost credit option.

17

74.     With respect to each of the Bank's violations of TILA for noncompliant disclosures, as alleged above, Plaintiff and the Sub-classes are entitled to recover up to $1,000,000 in statutory damages, together with actual damages, costs and reasonable attorney fees. 15 U.S.C. § 1640(a).

## *Violations of State Consumer Protection Laws*

75.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

76.     Defendant's provision of credit services and a package of consumer benefits to Plaintiff were primarily for Plaintiff's personal, family or household purposes.

77.     The provision of credit services and a package of consumer benefits to Plaintiff, an individual, thus constituted a "consumer transaction" with a "person" as those terms are defined under the Utah Consumer Sales Practices Act ("UCSPA"). Utah Ann. Code 13-11.

78.     Defendant is a "supplier," as that term is defined by the UCSPA and the Utah Truth in Advertising Act ("UTIAA"), Utah Ann. Code 13-11a, because at all relevant times it regularly solicited, engaged in or enforced consumer transactions.

18

79.    Defendant's written communications with Plaintiff contained in Exhibit A and other mailings regarding the issuance or the continued availability of credit and a package of consumer benefits were "advertisements," as that term is defined by the UTIAA,  because at all relevant times they were made by a supplier in connection with the solicitation of business.

80.    During the relevant period, Amex knowingly or intentionally characterized its fee for availability of credit and a package of consumer benefits to Plaintiff as a generally nonrefundable annual fee, rather than a series of monthly membership fees collected in advance for which customers who cancelled or had been cancelled early could obtain refunds for unused months, was a deceptive act or practice under the UCSPA and/or the UTIAA.

81.    During the relevant period, Amex's omissions and/or representations in billing statements, or in other account renewal materials it furnished Plaintiff, that the fee, after it appeared on the billing statement, could be reversed in full indefinitely, when in fact there was only a limited time for her to obtain that full reversal, was a deceptive act or practice under the UCSPA and/or the UTIAA.

82.    With respect to each of the Bank's deceptive or noncompliant disclosures or omissions, as alleged above, Plaintiff suffered a loss in the form of additional fees paid to Defendant, and she and the members of the Sub-class are entitled to recover additional actual and statutory damages available under Utah Ann. Code 13-11 and 13-11a for advertising and deceptive practices violations.

**WHEREFORE**, Plaintiff Taryn Singer prays on her behalf and on behalf of the Sub-classes that judgment be entered against Defendant as follows:

(1)     An order certifying the Sub-classes under Federal Rule of Civil Procedure 23(b)(2) and, additionally or in the alternative, an order certifying the Sub-classes under Federal Rule of Civil Procedure 23(b)(3);

(2)     Maximum statutory damages as provided under 15 U.S.C. § 1640(a)(2);

(3)     Actual damages as provided under 15 U.S.C. § 1640(a)(1);

(4)     Maximum statutory relief and damages provided under Utah Ann. Code 13-11 and 13-11a;

(5)     Attorney fees, litigation expenses, and costs; and

(6)     Such other and further relief as to this Court may seem just and proper.

## *Jury Demand*

Plaintiff respectfully requests a trial by jury.

Dated:  New York, New York
        September 14, 2017

                                        Respectfully Submitted,


                                By:     /s/ Brian L. Bromberg
                                        Brian L. Bromberg
                                        One of Plaintiff's Attorneys

Attorneys for Plaintiff

Brian L. Bromberg
Bromberg Law Office, P.C.
26 Broadway, 21st Floor
New York, NY 10004
(212) 248-7906

20

Harley J. Schnall
Law Office of Harley J. Schnall
711 West End Avenue
New York, NY 10025
(212) 837-2550